IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 20, 2017

## STATE OF TENNESSEE v. JOSHUA MICHAEL STEWART

### Appeal from the Criminal Court for Knox County
No. 104396    Steven Wayne Sword, Judge

### No. E2017-00864-CCA-R3-CD

The Defendant, Joshua Michael Stewart, was found guilty by a Knox County Criminal Court jury of rape of a child, a Class A felony, and two counts of aggravated sexual battery, a Class B felony. *See* T.C.A. §§ 39-15-522 (2014) (rape of a child), 39-13-504 (2014) (aggravated sexual battery). The trial court sentenced the Defendant to twenty-five years for rape of a child, twelve years for aggravated sexual battery, and eight years for aggravated sexual battery. The court ordered partial consecutive service, for an effective sentence of thirty-three years at 100% service. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions and (2) the court erred by denying his request to exclude references to his tattoos and relationship with his father from the recording of his police interview. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

J. Liddell Kirk (on appeal) and Scott C. Firth (at trial), Knoxville, Tennessee, for the appellant, Joshua Michael Stewart.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Charme P. Allen, District Attorney General; and Joan S. Stewart and Ashley McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

In this case, the Defendant was indicted for rape of a child and two counts of aggravated sexual battery. The victim was ages seven and eight at the time of the incidents and was the Defendant's stepsister.

The victim testified that her birthday was December 12, 2000, that she was age fifteen at the time of the trial, and that she was in the tenth grade. She said that she had lived with her father since eighth grade, that she had lived with her best friend's family for about six months before moving into her father's home, and that she had lived with her mother before living with her best friend's family.

The victim testified that between second and fourth grade, she lived with her mother, her stepfather, her younger brother, and the Defendant in a two-bedroom apartment. The victim said that she shared a bedroom with her younger brother and that the Defendant slept in the living room. She said that the Defendant was her "big brother" and that she looked up to him. She recalled the Defendant's babysitting her and her younger brother frequently and said that she talked to the Defendant about her problems and that she saw the Defendant as her protector. She said that the Defendant was age twenty-four or twenty-five during this time. She said that as she became older, she wanted to spend less time with the Defendant.

The victim testified that she was in court "[t]o prosecute [the Defendant] for making me touch him, touching me, and fingering me." She said this happened in the two-bedroom apartment and recalled she was in second grade at the time. She stated that one incident occurred at night after she had gone to bed. She said that she hated going to bed because she knew the Defendant would enter her bedroom. She said that the Defendant entered the room, that she attempted to act as though she were asleep, and that the Defendant "took [her] arm," "made [her] touch his penis" until he ejaculated on her hand, cleaned her hand with what she believed was a paper towel, and left the room. She recalled this incident "vividly" and said that the Defendant pulled the blanket away, grabbed her left arm, and did not speak. She said that her younger brother slept in the bedroom during the incident. She said that the Defendant did not hurt her when he grabbed her arm but that she was scared to pull away or to refuse him. She said that this incident was not the first time she had touched the Defendant's penis and said she knew it was a penis because "it was just one of those things that you could tell . . . . It was weird." She said the Defendant made her rub his penis by placing his hand around her hand and moving her hand up and down. She recalled hearing the zipper and button of the Defendant's pants before and after the incident and said it was warm outside. She said that the Defendant told her if she told anyone, they would never see each other again. She thought she was in the third grade at the time.

The victim testified that more than one incident occurred in the apartment, although she did not recall the events "vividly." She recalled one incident in which she awoke during the night, walked to her mother's bedroom, and asked her mother to come into her bedroom because she was scared of the dark. The victim said that her mother would not get out of bed, that the Defendant was awake in the living room watching pornography, and that she asked him if she could watch a Barbie movie. She said the Defendant replied, "Yeah, after you watch my movie." She recalled that she watched the Defendant's movie, that a woman

-2-

performed a sex act on a man, and that the Defendant told her if she were ever sick, she should come to him because "the white stuff would make [her] feel better." She said that the Defendant wanted her to "taste it," that she refused, and that the Defendant left her alone.

The victim testified that generally, the Defendant told her not to open her eyes each time he entered her bedroom and that the Defendant said frequently that "it was just a game and . . . he would play [her] game if [she] played his" game. She said she and the Defendant played board games and hide and seek. She said that generally, the Defendant usually told her she was "a good girl" after each incident before leaving her bedroom. She said that she was "surprised" the first few times the Defendant entered her bedroom at the apartment but that after a while, she "kind of got use[d] to it . . . and . . . anticipated it." When asked if she recalled anything about the Defendant's body, she said he "had a lot of tattoos."

The victim testified that about one month before her family moved out of the apartment and to a home on Jacksboro Pike, the Defendant moved into a home with his then-wife in Knoxville. The victim recalled visiting the Defendant's home frequently and said she was best friends with the Defendant's daughter. She described the layout of the Defendant's home and said that when she was about age nine and in the fourth grade, she slept in the Defendant's daughter's room or in the living room. She recalled one incident in the Defendant's daughter's bedroom during which the Defendant "made" her touch his penis with her hand. The victim said that the Defendant's daughter slept in the bedroom during the incident. The victim recalled lying on her back in the Defendant's daughter's bed and the Defendant's telling her to be quiet. She did not recall whether her eyes were closed. She said that she rubbed his penis, that he ejaculated, that he cleaned her hand, and that he left the bedroom. The victim said that she told the Defendant's daughter about the incidents and that the Defendant's daughter did not believe her.

The victim testified that a second incident occurred at the Defendant's home. She recalled that she fell asleep on the couch in the living room, that she faced the wall while lying on the couch, and that the Defendant came to the couch and "made" her touch his penis. She said that he took her hand and placed it on his penis, that he closed his hand around her hand, and that she rubbed his penis until he ejaculated. She did not see anyone else in the room but recalled that the television was on. The victim stated that generally, the Defendant forced her to touch him every time she stayed overnight at his home.

The victim testified that when she lived in the home on Jacksboro Pike with her mother and her stepfather, she did not share a bedroom. She recalled sleeping in the master bedroom and having a couch and a fireplace inside her bedroom. She said that the Defendant visited the home on the weekends, that sometimes he came alone, and that sometimes he came with his family. She said she was age eight or nine at this time. She recalled "a few times" when the Defendant touched her vagina "over [her] clothes" and said it felt "weird."

-3-

She said that this was not the same incident in which the Defendant inserted his finger into her vagina. She said that another incident occurred at night when everyone else was asleep, that she awoke and went to the living room, and that the Defendant "came in there" and watched television with her. She said that the Defendant placed his hands "through [her] clothes," that he touched her vagina inside her underwear, and that he placed his finger inside her vagina. She did not recall what television program was airing but said that she "was leaned up against him" on the couch and that they were "kind of half laying [sic] down, kind of propped up type of state." She said that afterward, the Defendant told her not to tell anyone. She said all of the incidents at the Jacksboro home occurred on the living room couch.

The victim testified that incidents also occurred inside her Jacksboro Pike bedroom at night after she had gone to bed. She recalled one incident in which she awoke when the television at the end of her bed moved and saw the Defendant standing at her bed. She said that the Defendant told her to close her eyes, that he took her hand, and that he "made" her rub his penis until he ejaculated. She did not recall the Defendant's clothes but knew nobody else was in the bedroom. She said another incident occurred in her bedroom but did not recall when it occurred. She said the last time it occurred, she was in the fifth grade and age nine or ten. She said that she turned age ten in December of her fifth-grade year.

The victim testified that she did not report the incidents because she and the Defendant's daughter were best friends, and she feared the Defendant's daughter would hate her. The victim also said she did not report the incidents because the manner in which the Defendant told her not to tell anyone about the incidents scared her. The victim said she did not think her mother would believe her. The victim said that she, ultimately, told the Defendant's daughter and the Defendant's son simultaneously and that she told her friend at school when they were in the sixth grade. The victim said she also told her mother when she was in the sixth grade.

The victim testified that she went to "Child Help" and that she discussed the incidents with a woman, and that she did not disclose everything because she did not "fully remember everything." She said that the incidents occurred between second and fifth grade and that although she did not recall the number of times she touched the Defendant's penis, she knew it was "a lot." She said the Defendant inserted his finger into her vagina once but touched her over her clothes more than once.

Knoxville Police Investigator Keith Johnson testified that he began investigating this case in January 2014, after he received a Department of Children Services' referral. He contacted the victim's father and scheduled a meeting for the victim at Child Help for a

forensic interview. Investigator Johnson said he interviewed the Defendant on March 27, 2014. An audio recording of the interview was played for the jury.

In the recording, the Defendant spoke to Investigators Johnson and Cook. The Defendant was provided a waiver of rights form and told he could end the interview at any time. He read and signed the form. One investigator asked if the Defendant's wrist tattoo was of a skull, and the Defendant confirmed he had tattoos of a skull and a razor blade. The other investigator told the Defendant that he wanted to obtain a "history" from the Defendant and asked for the Defendant's father's name. The Defendant identified his father and said he did not know if his father was married because he "had not talked" to his father. The Defendant said that his father was married to the victim's mother "as far as [the Defendant] knew." The Defendant identified his wife and five children. The investigators and the Defendant discussed the origins of the Defendant's children's names. The Defendant identified the victim's mother's and his father's children, including the victim.

The Defendant requested to know why the investigators were talking to him, and one investigator stated that the investigator wanted to know when the Defendant stayed with the Defendant's father and the victim's mother when the couple lived in the two-bedroom apartment, approximately three or four years before the interview. The Defendant said, "I stayed with my Dad . . . [when the victim] was staying with her father and [the victim's mother] was in a treatment facility." The Defendant said that he stayed at the apartment for a couple of weeks when the victim was there. The Defendant stated that he "stayed a few nights" at another home.

Investigator Johnson testified that no forensic evidence was obtained because the incidents occurred three to five years before the victim's disclosure. He said that his records showed the Defendant's birthday was July 8, 1982.

On cross-examination, Investigator Johnson testified that he did not interview the victim, her father, her mother, her stepfather, or her friend, whom the victim testified she told about the incidents. Investigator Johnson said that he did not examine Facebook or the victim's cell phone.

Upon this evidence, the Defendant was convicted of rape of a child and two counts of aggravated sexual battery. This appeal followed.

## I.      Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions for rape of a child in Count 1 of the indictment and aggravated sexual battery in Count 3 of the

indictment. He does not challenge his conviction in Count 2 for aggravated sexual battery. He argues that although the jury determined the victim's credibility, the victim's testimony about the two incidents elected in Counts 1 and 3 failed to show that these incidents were "distinct and separate" because they occurred in the same location, under similar circumstances, and with no chronological distinction. He also argues relative to Count 3 that the evidence failed to show the touching was reasonably construed to have been done for the purposes of sexual gratification. The State responds the evidence is sufficient to support the convictions. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522. Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id*. § 39-13-501(7) (2014).

Aggravated sexual battery is defined, in relevant part, as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when] [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). Sexual contact, in relevant part, is "the intentional touching of the victim's . . . [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate

parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id*. § 39-13-501(6) (2010) (amended 2013). Intimate parts are "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id*. at (2).

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask [for] a conviction, then the court cannot be assured of a unanimous decision." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993).

> This election requirement . . . ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The critical reason, however, for the election is to protect a defendant against "patchwork verdicts." *Shelton*, 851 S.W.2d at 137.

> [T]he election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated.

*State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001) (citing *State v. Brown*, 992 S.W.2d 389 (Tenn. 1999)). "[T]he State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction." *Id.* (citation omitted). "If a jury is allowed to convict without specific evidence supporting the election, then the election is superficial and meaningless." *State v. Johnny Lee Hines*, No. 01C01-9709-CC-00405, 1999 WL 33107, at *4 (Tenn. Crim. App. Jan. 27, 1999). "The offense must be proven in accordance with the election, i.e., to have occurred on [the elected] date and under [the] circumstances." *State v. Marvin D. Nance*, No. E2005-01623-CCA-R3-CD, 2007 WL 551317, at *6 (Tenn. Crim. App. Feb. 23, 2007) (citing *Johnny Lee Hines*, 1999

WL 33107, at *6), *perm. app. denied* (Tenn. May 14, 2007). Relative to an election of offense,

> [T]he standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the state's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the state must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

*Johnny Lee Hines*, 1999 WL 33107, at *4.

Relative to rape of a child, the State made the following election of the offense: "wherein the defendant was sitting on the couch with [the victim] and she was leaning back against him and he reached around her and inserted his finger inside her vagina."

The record reflects, in the light most favorable to the State, that the victim's date of birth was December 12, 2000, and that she was age eight or nine when she and her family moved to the Jacksboro Pike home. The victim testified that at this home, the Defendant visited and stayed overnight periodically, although he lived at another residence with his then-wife and children. The victim recalled one night on which everyone was asleep. She said that she awoke during the night and went into the living room. She said that the Defendant "came in there" and watched television with her. She said that the Defendant placed his hands "through her clothes," that he touched her vagina inside her underwear, and that he placed his finger inside her vagina. She did not recall what was airing on television but said that she "was leaned up against him" on the couch and that they were "kind of half laying [sic] down, kind of propped up type state." This was the only incident in which the victim testified the Defendant penetrated her vagina.

We conclude that the evidence is sufficient to support the Defendant's conviction for rape of a child. The victim's testimony reflects that she provided details about the nature of the incident, the sequence of events, and the type of sexual penetration involved. We note that the victim's credibility was determined by the jury, and the jury's verdict reflects it credited her trial testimony. The victim's testimony alone is sufficient to support the Defendant's conviction. *See State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (stating that a child victim's testimony regarding sexual contact can be sufficient to support a conviction). The victim testified that the Defendant penetrated her vagina with his finger and that she was age eight or nine at the time of the incident. Likewise, we conclude that the evidence regarding this incident was sufficient to support the State's election of the offense. The Defendant is not entitled to relief on this basis.

Relative to aggravated sexual battery alleged in Count 3, the State made the following election of the offense: "wherein the defendant and the victim were on the couch in the living room of the Jacksboro Pike home and the defendant touched her over the clothing covering her vagina, not the time he penetrated her vagina with his finger."

In the light most favorable to the State, the record reflects that the victim testified about the Defendant's touching her at the Jacksboro Pike home before the incident involving penetration. The victim testified that she recalled when the Defendant touched her vagina "over [her] clothes" and said it felt "weird." She said that this was a separate incident in which the Defendant inserted his finger into her vagina. She also stated that all of the incidents at the Jacksboro home occurred on the living room couch. We conclude that the evidence is sufficient to support the State's election of the offense and the Defendant's conviction.

Furthermore, whether the Defendant's touching the victim over her clothes was for the purpose of sexual arousal or gratification was a question of fact for the jury to determine. *See State v. Julius Weil Walton*, No. M2014-01337-CCA-R3-CD, 2015 WL 2257130, at *3 (Tenn. Crim. App. May 12, 2015) ("The determination of whether the contact was for the purpose of sexual arousal or gratification is a question of fact for the jury."); *see also State v. Mahlon Johnson*, No. W2011-01786-CCa-R3-CD, 2013 WL 501779, at *10 (Tenn. Crim. App. Feb. 7, 2013). Circumstantial evidence is often the basis for an aggravated sexual battery conviction, and jurors are permitted to "use their common knowledge and experience in making reasonable inferences from the evidence." *State v. Meeks*, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993). The State was not required to establish that the Defendant became sexually aroused or gratified by the touching but was only required to show that the touching was "reasonably construed as being for the purpose of sexual arousal or gratification." *See State v. Roy Chisenhall*, No. M2003-00956-CCA-R3-CD, 2004 WL 1217118, at *3 (Tenn. Crim. App. June 3, 2004). The Defendant's touching the victim's vagina over her clothes could have been reasonably construed as being for the purpose of sexual arousal or gratification by the jury. The Defendant is not entitled to relief on this basis.

## II. The Defendant's Police Statement

The Defendant contends that the trial court erred by denying his request to redact references to his tattoos and to his relationship with his father from the audio recording of his police interview. He argues that these references had no probative value to any material issue in dispute and were unduly prejudicial. The State responds that the trial court properly determined that the references had probative value and that the references did not create a danger of unfair prejudice to the Defendant. We agree with the State.

-9-

Before jury selection, the prosecution informed the trial judge that the recording of the Defendant's police interview had been redacted to remove any reference to the Defendant's confinement in the Department of Correction at the time of the interview. The defense did not object to this redaction. However, trial counsel requested that the recording be further redacted to remove references to the Defendant's arm tattoos depicting a razor and a skull. Counsel argued that the references were inflammatory and irrelevant to the proceedings. Counsel also requested redacting a discussion about the Defendant's father in which the Defendant states, "I don't know. I haven't talked to him." Counsel argued that the Defendant's relationship with his father was irrelevant to the proceedings and noted that the Defendant's father was not a trial witness or an alleged victim. Counsel argued that the statement suggested the Defendant might have been a "bad son" and did not get along with his family. The prosecution argued that the reference to the Defendant's tattoos was relevant to the victim's identification of the Defendant and that the victim would testify that the perpetrator had tattoos on his arms. The prosecution also argued that the Defendant's statement regarding his father was relevant to the extent that the offense involved family members.

The trial court found that any markings on a person were relevant to identity. Although the court questioned whether identity was an issue in this case based upon the familial connection between the victim and the Defendant, the court found that the State nonetheless had to establish the identity of the perpetrator. The court found that the evidence was not "very prejudicial at all." Relative to the Defendant's statement that he had not spoken to his father, the trial judge stated that he was unsure how the statement could have been prejudicial to the Defendant. The judge stated that whether the Defendant had "some broken relationship with his father" was an "issue for either side." The court determined that it was "kind of a stretch to say" that the statement should be excluded based upon relevancy or the danger of unfair prejudice to the Defendant. The court found that the recording was relevant to observing the Defendant's demeanor and behavior while interacting with the police officers and to the Defendant's credibility. The court denied the Defendant's redaction requests.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*,

204 S.W.3d 772, 778 (Tenn. 2006).  Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Tenn. R. Evid. 403.

Relative to the Defendant's tattoos, the State argued that the reference was relevant to the victim's identification of the perpetrator and that the victim would testify about the Defendant's arm tattoos.  "The identity of the perpetrator is an essential element of all crimes and may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010) (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)).  The record reflects that the victim testified that the Defendant digitally penetrated her vagina, touched her vagina over her clothes with his hand, and forced her to rub his penis.  She also testified that the Defendant "had a lot of tattoos."  We note that she did not testify about the location or design of the tattoos.

We conclude that evidence of the Defendant's tattoos as an identifying characteristic had minimal relevancy in this case.  The Defendant's identity was established by the victim's testimony that the Defendant was the perpetrator.  The victim and the Defendant had a familial relationship, and nothing in the record suggests the victim was unsure about the identity of the perpetrator.   Likewise, although the victim testified that the Defendant had many tattoos, the prosecution never asked the victim to identify the location or design of any tattoo.  As a result, the relevancy of the Defendant's skull and razor blade tattoos was diminished significantly.  In any event, the recording reflects that the investigator's asking about the Defendant's tattoos was in the course of a casual and general conversation.  Nothing in the record establishes that the reference to the tattoos was unfairly prejudicial to the Defendant.  The reference was short and was not emphasized in relation to the facts of this case.  Although the evidence had little relevancy, we conclude that the trial court did not abuse its discretion by denying the Defendant's request to redact the recording in this regard.  The Defendant is not entitled to relief on this basis.

Relative to the Defendant's relationship with his father, the State argues that the statement the Defendant had not talked to his father was relevant to showing the offense involved family members.  During the interview, the investigator asked questions related to the Defendant's family.  The Defendant identified his father and the victim's mother.  Although the Defendant believed his father and the victim's mother were married, he had not talked to his father.  The Defendant also provided the investigator with his wife's and children's names, and the Defendant and the investigators discussed the origins of names of his children.  The Defendant also identified his father's and the victim's mother's children, including the victim.  The reference to the Defendant's not having spoken to his father was brief, and the investigators did not question the Defendant about his relationship with his

father. Based upon the entire familial "history" the Defendant provided, we conclude that the discussion was minimally relevant to show the Defendant's and the victim's family connection, which arguably supported the victim's identification of the Defendant. Likewise, the Defendant's reference to his father, when viewed in the context of the entire interview, did not unfairly prejudice the Defendant. We conclude that the trial court did not err by denying the Defendant's request to redact the recording in this regard. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE